**UNITED STATES DISTRICT COURT**
District of New Jersey

<table>
<tr>
<td>
CHAMBERS OF<br>
**JOSE L. LINARES**<br>
JUDGE
</td>
<td align="right">
MARTIN LUTHER KING JR.<br>
FEDERAL BUILDING & U.S. COURTHOUSE<br>
50 WALNUT ST., ROOM 5054<br>
P.O. Box 999<br>
Newark, NJ 07101-0999<br>
973-645-6042
</td>
</tr>
</table>

**NOT FOR PUBLICATION**

<u>**LETTER OPINION**</u>

January 25, 2011

<u>**Via Electronic Filing**</u>

Jennifer Walker, Esq.
Law Office of Harry J. Binder and Charles E. Binder, P.C.
60 East 42nd St., Suite 520
New York, NY 10165

Dennis J. Canning
Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004

      Re: **<u>Thomas J. Cardinuto v. Commissioner of Social Security</u>**
         **Civil Action No.: 10-1616 (JLL)**

Dear Counsel:

  Presently before the Court is an appeal filed by Thomas Cardinuto (hereinafter "Claimant") seeking review of the Administrative Law Judge's ("ALJ") decision denying his claim for Disability Insurance Benefits ("DIB"). No oral argument was heard pursuant to <u>Federal Rule of Civil Procedure 78.</u> Plaintiff claims that the ALJ's decision was not supported by substantial evidence and therefore requires reversal, or alternatively, remand to the Commissioner for further proceedings. In opposition, Defendant argues that the ALJ's findings are supported by substantial evidence and should be upheld. The Court, having considered the parties' submissions, and for the reasons set forth below, affirms the decision of the Commissioner of Social Security.

**<u>PROCEDURAL HISTORY</u>**

  On October 12, 2001, Claimant applied for DIB. The application was denied initially and again upon Reconsideration. Hearings were held before ALJ Christopher P. Lee on October 8 and December 9, 2003. ALJ Lee denied Claimant's application on March 30, 2004 and the Appeals

Council further denied Claimant's request for review. Claimant then filed a civil action in this Court before the Honorable Judge Hayden, who on October 25, 2005 approved a stipulation and ordered a remand for further administrative hearings. On April 12, 2006, the Appeals Council issued an order remanding ALJ Lee's 2004 decision. A third hearing was held before ALJ Katherine Edgell on December 6, 2006. ALJ Edgell found that Claimant was not disabled and denied Claimant's application for DIB. On February 17, 2010, the Appeals Council denied Claimant's request for review. Claimant now appeals ALJ Edgell's ruling pursuant to 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Claimant, Thomas Cardinuto, was born on April 23, 1953 (R. 108). He has a high school education, is fluent in English, and worked as a data entry clerk for the Associated Press from 1969 until his alleged onset date of May 13, 1994. (R. 26-27). As a data entry clerk, Claimant was required to type on a computer keyboard during the full workday. (R. 364-67). Claimant carried DIB from his alleged onset date through December 31, 1999, the Date Last Insured ("DLI"). (R. 35).

Claimant's symptoms began the morning of May 12, 1994, when he allegedly woke up with pain in both arms that had appeared overnight. (R. 28). At the time, Claimant had a twelve year history of pain and numbness in both wrists and hands. (R. 258). Claimant went to see Dr. Feuer, M.D., the following day, who performed an EMG/Nerve Conduction Velocity Test, which revealed moderate to severe carpal tunnel syndrome. (R. 28, 251). He was treated with bilateral wrist splints, as well as Naprosyn, without relief. (R. 259). Claimant has not worked since May 13, 1994, the date of his first doctor's visit regarding these symptoms. (R. 199).

Claimant next went to see Dr. Zaretsky, M.D., on July 11, 1994 where he underwent an orthopedic evaluation. (R. 259). Dr. Zaretsky reported muscle strength of both upper extremities at a full 5/5 with intact reflexes. Id. Hand strength was also full at 5/5 in all planes. Id. There was positive Phalen and Tinel testing[1], consistent with bilateral carpal tunnel syndrome. Id. Dr. Zaretsky saw Claimant again on October 24, 1995, finding that motion of the digits in both wrists was satisfactory and that Claimant was partially disabled. (R. 200).

Claimant received physical therapy at the Kessler Institute from March 7 through May 17, 1995. (R. 205-210). April 12 progress notes indicated that Claimant's goal was to avoid surgery and that Claimant stated "[I] have to go back to work." (R. 208). On his May 17 discharge, Claimant continued to show no functional deficits, a normal range of motion, and his two-point discrimination was within normal limits. (R. 205). Claimant indicated that he would be taking a trip down to South Carolina.[2] Id.

---

[1] Tinel's and Phalen's signs are used to diagnose carpal tunnel syndrome by reproducing symptoms via tapping on the wrist (Tinel) or flexing the wrist (Phalen). See The Merck Manual 335 (18th ed. 2006).

[2] During his December 6, 2006 hearing in front of ALJ Edgell, Claimant admitted to vacationing with friends in South Carolina after his alleged onset date in 1994. (R. 478).

Claimant came under the care of his current treating physician, Dr. Nainzadeh, M.D., on February 22, 1995. During the first visit, Dr. Nainzadeh had the impression of bilateral carpal tunnel syndrome and left lateral epicondylitis. (R. 256) Regarding Claimant's physical ability as of the first visit, Dr. Nainzadeh stated that "at the present time he is not able to use the computer keyboard." (R. 257). Over the next five years, Claimant saw Dr. Nainzadeh on a regular basis. Dr. Nainzadeh continually reported bilateral and positive Tinel for median nerve at the wrist and for ulnar at the elbow. (R. 223-50). After Claimant's September 26, 1995 visit, Dr. Nainzadeh concluded "patient is not able to work or do anything for a long period of time." (R. 242). On his February 21, 1996 visit to Dr. Nainzadeh, Claimant stated that "he is working on his car and tries to be active as much as he can. However, the pain does not allow him." (R. 241). After Claimant's April 3, 1997 visit, Dr. Nainzadeh stated, "[p]atient's condition is progressively getting worse . . . Further delay in authorization [of surgery] may result in permanent nerve damage." (R. 238). In his July 22, 1998 evaluation, Dr. Nainzadeh recorded Claimant had motor power of 5/5 proximally and stated "[p]inch has always been good and is still good, it is around 28-30 lbs bilaterally. Grip is around 80-100 lbs." (R. 235). He further recorded that Claimant said he gets tingling, numbness and pain as soon as he starts doing minor work and driving. Id. After an August 17, 1999 visit, Dr. Nainzadeh recorded Claimant had increasing pain and numbness with even minimal activities; even use of the phone gave him increasing pain. (R. 233). Finally, on December 28, 1999 Dr. Nainzadeh reported "[a]t this present time he is totally disabled in performing his regular duties of his job due to pain and nerve injuries in both upper extremities and tendinitis. Therefore, he should be considered totally disabled at this time." (R. 232)[3] (emphasis added).

Dr. Nainzadeh continued to treat Claimant after the expiration of his DLI. In three Workers Compensation Board billing forms filled out by Dr. Nainzadeh in 2004, 2005 and 2006, the doctor repeatedly stated on line 5 that Claimant had a partial permanent disability of upper extremities, but then indicated on line 6 that Claimant was totally disabled from regular duties or work. (R. 288, 290, 424). In a Bilateral Manual Dexterity Impairment Questionnaire on November 15, 2006, Dr. Nainzadeh opined that Claimant had significant limitations doing repetitive reaching, handling, fingering or lifting and that "patient is unable to do any work." (R. 444). However, later in the same report, Dr. Nainzadeh solely checked off "no pushing" "no pulling" "no kneeling" and "no stooping" as limitations affecting Claimant's ability to work a regular job and further wrote "[p]atient is unable to use the computer keyboard." (R. 444-45). In response to the question "[i]n your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies," Dr. Nainzadeh responded "early 1995." (R. 445). In a letter written the same day, Dr. Nainzadeh stated, "Mr. Cardinuto is unable to return to his previous profession and use the computer keyboard anymore . . . His condition is more than 11 years old and has become chronic." (R. 439).

Regarding Claimant's level of activity, in an October 23, 2001 Social Security Administration Pain Report Claimant filled out, in response to the question "what causes pain or makes it worse," Claimant answered, "different things as talking on the telephone, writing, driving for to [sic] long,

---

[3]This December 28, 1999 report was created in connection with Claimant's Worker's Compensation Claim. Therefore, the Court construes the language "he should be considered totally disabled at this time," as referring specifically to the regular duties of his keyboard controller job.

basically anything where my arms and hands are needed for any period of time." (R. 146). He further stated that he spends a typical day reading books, magazines, newspapers and watching television, he rarely performs light household chores, and he drives "but not for prolonged periods without discomfort and pain in writs and numbness in fingers." (R. 149).

During the October 8, 2003 hearing in front of ALJ Christopher Lee, when asked "[i]f someone asked you to be a security guard sitting behind a desk and looking at a monitor and check people in every so often, would you be able to do that," Claimant answered, "I would think so, as long as it doesn't involve using my hands too much." (R. 392).

During his December 6, 2006 hearing in front of ALJ Edgell, Claimant stated "I can't do anything on a consistent basis." (R. 465). He said he could button buttons, groom himself and drive for up to 30 minuets[4] before he needed to stop and pull over for a short break. (R. 472). In response to the question, "[h]ow is your grip and handling ability like opening jars," Claimant responded, "[I] might have a little pain in the wrist . . . [b]ut if you have to open a jar, you open a jar and you put up with the pain." (R. 473). In response to the ALJ's question, "[w]hen you're holding or reading a paper in your hand . . . how long can you do that before you start feeling pain," Claimant responded "10, 15 minutes if I keep my hand in one position . . . I have to put it down straight and then it goes back to normal in a few minutes, 10, 15 minutes." (R. 476-77). Finally, when asked whether he traveled in 1994 and 1995, Claimant stated that he traveled down to Myrtle Beach, South Carolina with friends.[5]

During the December 6, 2006 hearing in front of ALJ Edgell, the vocational expert ("VE"), Amy Leopold, testified regarding Claimant's ability to preform existing work in the national economy. The VE testified that while Claimant was not able to perform his past work as a keyboard operator, given his age, education, work experience and RFC, Claimant would be able to perform the work of either messenger[6] or gate guard, which are both light and unskilled work existing in significant numbers both locally and nationally.[7] (R. 485). The VE added that the position of gate

---

[4]The Court acknowledges Claimant's statement that he only takes long drives to see his mother, who lives 80 miles away from Claimant in Toms River, New Jersey. (R. 472).

[5]While Claimant did not specifically state how many times he went on vacation during 1994 and 1995, the Court construes his answer during the December 6, 2006 hearing as evidence that Claimant went on vacation to South Carolina more than once after he stopped working in 1994. (R. 478).

[6]The VE identified the position of messenger as Dictionary of Occupational Titles ("DOT") # 239.567-010. However, this number corresponds to the position of Office Helper (Clerical). The Court does not find this discrepancy determinative, as the DOT definition explains that an office helper "[m]ay specialize in delivering mail, messages, documents, and packages between departments of establishment and may be designated Messenger, Office (clerical)." DOT § 239.567-010 (emphasis added).

[7]The VE testified that the job of messenger presented 22,000 jobs locally and over

guard would not require repetitive use of the hands. Id.  When asked how long one would have to use their hands at a time as a gate guard, the VE responded "less than a minute at a time." (R. 487).

## LEGAL STANDARDS

Under the Social Security Act, a claimant must demonstrate that he is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is disabled for these purposes only if his physical or mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 1382c(a)(3)(B).  The Social Security Regulation has established a five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520(a)(4).

The sequential evaluation process is a series of five steps followed in order.  If it is determined that the claimant is disabled or not at any step, a decision is made and the evaluation will cease.  If a determination cannot be made that the claimant is disabled or not at any step, the evaluation will continue to the next step.  At step one, the Commissioner is required to determine if the claimant is engaging in substantial gainful activity.  If not, the Commissioner must determine at the second step whether claimant has any "severe impairments."  If the claimant does have severe impairments, the Commissioner proceeds to the third step to determine whether the impairment meets or equals the criteria of a "per se disabling" impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner then proceeds to the fourth step where he must determine claimant's residual functional capacity ("RFC") and determine whether claimant can return to his past relevant work.  If claimant is unable to perform his past relevant work based on his RFC, the Commissioner proceeds to the final step.  At step five, the burden shifts to the Commissioner to show that, based on claimant's RFC and vocational factors, claimant can perform other work existing in significant numbers in the national economy.  If the Commissioner cannot show that claimant can perform other work in existence, claimant is determined disabled and is entitled to disability benefits.

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). The Court must affirm the ALJ's decision if it is supported by substantial evidence. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); see also 42 U.S.C. § 405(g).  Substantial evidence is more than a "mere scintilla" of evidence and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  Thus, when the "[ALJ] is faced with conflicting evidence he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987).  The reviewing court must consider the totality of the evidence and then determine whether

---

500,000 jobs nationally, and the job of gate guard presented 8,000 jobs locally and over 319,000 jobs nationally. (R. 485).

5

there is substantial evidence to support the Commissioner's decision.  See generally Taybron v. Harris, 667 F.2d 412, 413 (3d Cir., 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir., 1992).  Rather, the court must give deference to the administrative decision.  See Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (review is limited to determining whether decision as a whole is arbitrary, capricious, or contrary to law).

In the determination of whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider the: "(1) objective medical facts; (2) diagnoses and medical opinions of examining physicians; (3) subjective evidence of pain and disability as described by plaintiff and corroborated by others who have observed him; and (4) plaintiff's age, educational background and work history." Curtain v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).  When a medical opinion is consistent with other substantial evidence, it is given controlling weight. 20 C.F.R. §§ 416.927(c)(1), (d)(2) (2007).  However, if a medical opinion is either inconsistent with other evidence in the case or is internally inconsistent, the Commissioner will "weigh all of the evidence [to decide] whether [the claimant] is disabled . . ." 20 C.F.R. § 416.927(c)(2).  With this framework in mind, the Court now turns to Claimant's arguments.

## LEGAL DISCUSSION

### A.    Summary of the ALJ's Findings

The Court begins by reviewing the ALJ's application of the above five-step process.  At step one, ALJ Edgell found that Claimant was not engaged in substantial gainful activity from the alleged onset date through the DLI. (R. 306).  The ALJ then concluded at step two that Claimant had severe bilateral carpal tunnel syndrome and severe cubital tunnel syndrome with epicondylitis through the DLI, based on medical evidence in the record.[8] (R. 306-07).  Accordingly, the ALJ proceeded to step three, where she determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 307).  The ALJ then proceeded to step four.

At step four, after considering the entire record, ALJ Edgell found that Claimant had the RFC to "lift light objects and sit, stand and walk throughout the workday but was limited to tasks involving only occasional manipulations and feeling with the hands and that afforded the ability to periodically rest between performing tasks with his hands." (R. 307).  The ALJ further stated that Claimant "was limited to lifting objects that weighed no more than ten pounds." (R. 308).  The ALJ's determination was based partially on her finding that Claimant's physical examinations prior to the DLI did not reflect debilitating symptoms.

In support of her RFC determination, ALJ Edgell pointed to Dr. Zaretsky's July 1994 report stating that Claimant retained intact strength in his upper extremities and hands and subsequent reports that Claimant retained an excellent range of motion in the hands and elbows. (R. 307).  She

---

[8]ALJ Edgell considered reports from Dr. Zaretsky, Dr. Nainzadeh, and treatment records from the Kessler Institute for Rehabilitation, Hand Center. (R. 306-07).

also pointed to the March 7 through May 17, 1995 treatment records from the Kessler Institute for Rehabilitation, Hand Center showing Claimant had no functional deficits and retained intact hand and arm strength as well as a normal two point finger discrimination. (R. 308). Finally, the ALJ found that while Dr. Nainzadeh's reports indicated that Claimant had decreased sensation in the writs and hands, a May 1997 examination found Claimant retained good motor function in his upper extremities and the ability to pinch at least 24 pounds and grip at least 90 pounds with his hands, and a December 1999 examination found that Claimant retained intact power in his arms and hands. Id. The ALJ did not give great weight to Dr. Nainzadeh's reports created after the DLI, opining that Claimant is totally disabled, unable to work and unable to use his hands or perform repetitive reaching, handling and fingering. Id. The ALJ stated that such reports did not relate to the period at issue because they were created subsequent to the DLI. Id. Instead, the ALJ gave greater weight to the reports made by Dr. Nainzadeh prior to the DLI, which opined that Claimant was unable to engage in any computer keyboarding and "totally disabled from his regular duties." Id.

The ALJ's RFC determination was also based on her finding that Claimant's activity level until the DLI "tends to belie the degree of incapacitation alleged." (R. 308). Specifically, the ALJ pointed to an October 2001 questionnaire, subsequent to the DLI, where Claimant indicated he remained able to drive his car, pay bills, perform light household chores and read books, magazines and newspapers, finding that all of these activities require the use of both hands for grasping and manipulating. Id. The ALJ elaborated that while Claimant may have had limited performance of these activities, any impairments were not so severe as to preclude Claimant from using his hands and arms. Id.

Based on these findings, ALJ Edgell determined that Claimant's symptoms were not intense, frequent, or persistent enough to preclude Claimant from performing low levels of work on a sustained basis from the alleged onset date through the DLI. Id. She determined that Claimant retained an RFC to sit, stand and walk throughout the workday. Id. She further found that due to Claimant's bilateral hand and arm abnormalities, Claimant was limited to lifting objects weighing no more than ten pounds and could not perform tasks requiring more than occasional manipulations and feeling and required rests between hand use. Id.

Subsequently, the ALJ found that according to Claimant's RFC, Claimant was unable to perform his past relevant work of computer maintenance controller, as this job required computer keyboarding involving sustained manipulative functions. (R. 309). The ALJ next proceeded to step five, where she found that considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could have performed through his DLI. (R. 310). The ALJ based this determination upon testimony of the VE who opined that Claimant would have been able to perform the jobs of messenger and gate guard through his DLI. Id. Due to the determination that Claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, the ALJ found that Claimant was not under a disability from his alleged date of onset through his DLI. Id.

7

B.    **Analysis**

   1.   The ALJ Properly Evaluated the Opinions of Claimant's Treating Physician, Dr. Nainzadeh.

Claimant argues ALJ Edgell's determination not to give great weight to the post-DLI opinions of Dr. Nainzadeh, specifically the refusal to credit opinions that Claimant's impairments had precluded all work since 1994, was improper. Claimant correctly points to the treating physician rule of 20 CFR § 404.1527(d)(2), which explains that an ALJ should give more weight to treating sources. The Code further states, "[i]f we find that a treating source's opinion on the issues(s) of the nature and severity of your impairment(s) is well supported by medically acceptable . . . techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 CFR § 404.1527(d)(2).

The Court finds ALJ Edgell gave proper weight to Dr. Nainzadeh, the treating physician. While the ALJ refused to give great weight to Dr. Nainzadeh's post-DLI reports, she gave greater weight to his pre-DLI reports, which continuously opined that Claimant was <u>unable to engage in his old occupation</u> as a computer keyboard operator and was <u>totally disabled from his regular duties</u>. The ALJ properly followed the Code by refusing to give controlling weight to Dr. Nainzadeh's post-DLI opinions that were inconsistent with other substantial evidence, mainly his own pre-DLI reports, in Claimant's record.[9]

While Dr. Nainzadeh reported in a November 15, 2006 Bilateral Manual Dexterity Impairment Questionnaire that Claimant was unable to do any work since 1995 (R. 444-45), such opinion is inconsistent with the Doctor's own reports prior to December 31, 1999, which continuously stated, solely, that Claimant was unable to perform the regular duties of his previous job as a keyboard operator. (R. 232, 257). Furthermore, in a November 15, 2006 letter accompanying the Bilateral Manual Dexterity Impairment Questionnaire, Dr. Nainzadeh did not mention total disability, but rather stated, "[Claimant] is unable to return to his previous profession and use the computer keyboard anymore." (R. 439).[10]

---

[9]The ALJ was incorrect to deny great weight to Dr. Nainzadeh's post-DLI reports simply because "they were all provided subsequent to the expiration of the [C]laimant's [DLI], and as such do not relate to the period at issue in this case." (R. 308). Dr. Nainzadeh stated in a November 15, 2006 Bilateral Manual Dexterity Impairment Questionnaire that the symptoms in the questionnaire applied back to 1995, indicating the questionnaire related back to the pre-DLI period. However, this issue is not dispositive, as the ALJ would have been correct to deny great weight to the treating physician's post-DLI reports, as such reports were in conflict with the Doctor's own reports made during the actual pre-DLI period at issue.

[10]Dr. Nainzadeh's statement in the November 15, 2006 letter that, "[Claimant's] condition is now more than 11 years old and it has become chronic," (R. 439) does indicate that the letter related back to the period before the DLI. However, the Court simply construes this statement to mean the conditions of Bilateral Carpal Tunnel Syndrome and Cubital Tunnel

With such inconsistencies in Dr. Nainzadeh's pre-DLI and post-DLI reports, the ALJ properly refused to give controlling weight to the post-DLI opinions of total disability. The ALJ appropriately gave greater consideration to the treating physician's reports created between the alleged onset date through the DLI. The ALJ correctly used the opinions in Dr. Nainzadeh's pre-DLI reports to help her determine Claimant's RFC and conclude that Claimant was unable to perform his past relevant work. The Court finds that ALJ Edgell properly evaluated all opinions of Claimant's treating physician, Dr. Nainzadeh, and gave appropriate weight to each. Accordingly, there was substantial evidence to support the ALJ's decision not to give great weight to Dr. Nainzadeh's post-DLI opinions of total disability.

      2.      The ALJ Properly Assessed Claimant's Credibility

Claimant argues the ALJ's determination regarding Claimant's credibility should be reversed. The ALJ determined that Claimant's complaints were not credible because Claimant's activity levels during the period at issue undermined the degree of incapacitation alleged. (R. 308). The ALJ stated that activities undertaken on a daily basis suggested Claimant had a greater level of hand and arm mobility than contended. Id. ALJ Edgell pointed to an October 23, 2001 Social Security Questionnaire where Claimant indicated he was able to drive, pay bills, perform light household chores and read books, magazines and newspapers.[11] (R. 146, 149). The ALJ stated that while Claimant may have had limited performance of these activities due to his impairments, "[no] symptoms that occurred were of such intensity, frequency or persistence as to preclude the performance of at least low levels of work related activities on a sustained basis." (R. 308).

Claimant cites to Smith v. Califano, to establish that the mere ability to perform household chores does not undermine a claim of disability. 637 F.2d 968 (3d Cir. 1981). The Smith court stated, "sporadic or transitory activity does not disprove disability." Id. at 971-72. The court cited to Yawitz v. Weinberger, where the Eighth Circuit determined that a claimant was disabled due to headaches even though he drove a car, took cross country camping trips and did handiwork around the house. 498 F.2d 956 (8th Cir. 1974). While the Court acknowledges that a claimant's sporadic activity does not necessarily disprove disability, the Court finds that the activities conducted by Claimant Cardinuto, compared with his alleged disability, were incongruent.

Unlike the claimant in Yawitz who complained of debilitating headaches, Claimant Cardinuto alleged a disability of major dysfunction of the wrists of each upper extremity. (R. 39). Claimant argued before ALJ Lee that he met listing 1.02B of the Social Security Disability Listing of Impairments. (R. 39). Listing 1.02B involves one major peripheral joint, in this case the wrist, in each upper extremity that results in the inability to perform fine and gross movements effectively as defined in 1.00B2c. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02B. Agency regulations at 1.00B2c

---

Syndrome have been present since 1995, without regard to any opinions of disability.

[11] During his December 6, 2006 hearing in front of ALJ Edgell, Claimant stated he could button buttons, groom himself and drive for up to 30 minuets before he needed to stop and pull over for a short break. (R. 472).

9

construe an inability to perform fine and gross movements to mean an extreme loss of function of both upper extremities that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. See id. at 1.00B2c. The regulation includes examples such as the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, and the inability to sort and handle papers or files. Id. While a claimant with severe headaches may be able to drive and do handiwork around the house, the Court finds that a claimant who alleges major dysfunction of the wrists resulting in the inability to perform fine and gross movements would not be able to perform such activities.

The Court finds that ALJ Edgell properly determined Claimant's complaints were not credible because Claimant's activity levels during the period at issue undermined the degree of incapacitation alleged. Accordingly, there was substantial evidence to support the ALJ's decision that Claimant's complaints were not wholly credible.

### 3. The ALJ Properly Determined Claimant's RFC

Claimant further argues the ALJ did not properly assess Claimant's RFC on a function-by-function basis as required by Social Security Ruling ("SSR") 96-8p. Claimant argues that the RFC expressed by ALJ Edgell is too vague to satisfy SSR 96-8p, as it "does not quantify the maximum amount of each work related activity [Claimant] can perform in an ordinary work setting on a regular and continuing basis." (Pl. Br. at 10). SSR 96-8p is a policy interpretation issued by The Social Security Administration ("SSA") directing how ALJ's should assess the RFC of a particular claimant. SSR 96-8p (1996). In that interpretation, the SSA requires the ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p(4). However, no functional assessment is required when there are no allegations of, or information in the record pointing to, physical or mental limitations of a specific functional capacity. SSR 96-8p(3). Absent such a showing, the ALJ must consider the claimant to have no limitation or restriction with respect to that functional capacity. Id.

Here, the ALJ relied on the record to determine that Claimant's functional limitations were confined to his ability to lift, carry and manipulate objects with his hands.[12] Claimant did not allege limitations of any other body parts or functions, and no information in the record pointed to any other limitations during the relevant period. Accordingly, the ALJ was correct to consider Claimant as having no limitations or restrictions with respect to his ability to perform functions not involving his upper extremities and hands. Therefore, the ALJ correctly found Claimant able to "sit, stand and walk throughout the workday." (R. 307).

Once the ALJ determined that Claimant's functional limitations were confined to his ability to lift, carry and manipulate objects with his hands, the ALJ correctly assessed Claimant's work related abilities. ALJ Edgell found that Claimant had the RFC to "lift light objects . . . but was

---

[12]Claimant testified during his hearings in front of both ALJ Lee and ALJ Edgell that he liked to walked a lot and that walking and standing did not cause him any problems. (R. 33, 36, 469). Furthermore, all of the medical evidence in record related to Claimant's use of his upper extremities and hands, not to the use of the rest of his body or his ability to sit, stand, or walk.

limited to tasks involving only <u>occasional</u> manipulations and feeling with the hands and that afforded the ability to periodically rest between performing tasks with the hands." (R. 307) (emphasis added). ALJ Edgell further found that Claimant "was limited to lifting objects that weighed no more than ten pounds." (R. 308). The Court does not find this RFC too vague to satisfy SSR 96-8p, as Claimant contends.

Claimant cites to <u>Figueroa v. Comm'r of Soc. Sec.</u> to demonstrate an RFC that was considered too vague by this court. 07-CV-2813, 2008 WL 2397595 (D.N.J. June 10, 2008) (Wigenton). In <u>Figueroa</u>, the court found the ALJ's RFC determination that Claimant could perform "a wide range of exertional work activities which do not involve more than simple repetitive tasks," to be too vague. 2008 WL 2397595 at *6. The court remanded the case, stating that the ALJ should have "specifically indicated the [claimant's] capabilities in the workplace . . . includ[ing] a discussion of how much weight [claimant] can carry, and for how long . . ." <u>Id.</u> Unlike the very generalized RFC statement in <u>Figueroa</u>, the Court finds that ALJ Edgell did specifically indicate Claimant's capabilities in the workplace regarding his functional limitations. The ALJ properly quantified Plaintiff's weight lifting limitations to no more than ten (10) pounds. (R. 308). The ALJ also quantified the time limits of Claimant's arm and hand functions. SSR 83-10 defines "occasionally" to mean "occurring from very little up to one-third of the time." SSR 83-10. By stating that Claimant was limited to tasks involving only <u>occasional</u> manipulations and feeling with the hands and that afforded the ability to periodically rest between performing tasks with the hands, the ALJ assessed that Claimant was limited to performing short term tasks with the hands for no more than one-third of an eight (8) hour workday.[13]

The Court finds that ALJ Edgell gave an appropriate analysis of Claimant's functional limitations and resulting RFC, and that such analysis was not vague. The Court further finds that substantial evidence exists in the record supporting the ALJ's assessment of Claimant's RFC.

4. <u>The ALJ's Determination That Claimant Could Perform Work In The National Economy Was Based On Proper VE Testimony</u>

Claimant further contends that ALJ Edgell's determination that Claimant could perform work existing in significant numbers in the national economy was improperly based upon flawed VE testimony. Claimant first argues that the ALJ could not have possibly identified jobs in the national economy that would accommodate Claimant's RFC because the ALJ gave too vague a statement for and appropriate RFC. (Pl. Br. at 14). As discussed above, the Court finds that the ALJ did give a satisfactory RFC definition, and therefore Claimant's argument fails on this matter.

Claimant also argues that a conflict exists between the VE's testimony that Claimant could perform the job of messenger and the definition of messenger in the DOT. Claimant states that the job of messenger requires manipulative capabilities, which would be precluded by Claimant's RFC.

---

[13] ALJ Edgell's RFC determination in her Decision is supported by her December 6, 2006 hearing where she asked the Vocational Expert, "what if he's limited to occasional [work] which I'm assuming is a third of the day." (R. 486).

(Pl. Br. at 14). While the VE was correct to testify during the December 6, 2006 hearing that the position of messenger is light and unskilled and requires a claimant to carry small packages up to ten (10) pounds, the DOT definition of "Office Clerk" (which includes the job of messenger, supra at n. 6) requires "frequent" reaching, handling and fingering, existing between one-third to two-thirds of the time. DOT § 239.567-010. The requirement of frequent reaching, handling and fingering directly conflicts with the ALJ's determination of Claimant's RFC, which limited Claimant to tasks "involving only occasional manipulations and feeling with the hands." (R. 307). However, such conflict does not require this Court to reverse the ALJ's decision.

Claimant correctly cites to Boone v. Barnhart, where the Third Circuit reversed the ALJ's decision due to a conflict between the VE's listing of multiple medium work rated jobs available for claimant and the ALJ's determination that claimant's RFC was limited to light work. 353 F.3d 203 (3d Cir. 2003). However, the Boone court stated that they were not adopting a general rule that an unexplained conflict between a VE's testimony and the DOT necessarily requires reversal. Id. at 206. In Boone, the court was very concerned that the three possible occupations the VE listed as available for claimant, each of which were rated medium work, all possessed explicit conflicts with claimant's light work RFC. Id. at 206-07. In the present case, while the VE may have improperly cited the job of messenger as an available occupation for Claimant, the VE also identified the position of gate guard, which did not conflict with Claimant's RFC and which existed in significant numbers in the national economy.

Because the VE identified at least one job which Claimant could perform in accordance with his RFC, the Court finds that there was substantial evidence in the record in the form of VE testimony to support the ALJ's determination that jobs existed in significant numbers in the national economy that Claimant could have performed.

## CONCLUSION

For the reasons discussed above, the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act was supported by substantial evidence. The decision of the Commissioner is hereby affirmed.

An appropriate order accompanies this Opinion.

/s/ Jose L. Linares
JOSE L. LINARES,
UNITED STATES DISTRICT JUDGE